1
2
3                              UNITED STATES DISTRICT COURT
4                              NORTHERN DISTRICT OF CALIFORNIA
5
6
7  JAJCO, INC. dba ANCHOR DRUGS
   PHARMACY,
8
                Plaintiff,                      No. C 12-05703 PJH
9
          v.                                    **ORDER DENYING MOTION TO
10                                              DISMISS AND STRIKE THIRD
   LEADER DRUG STORES, INC., et al.,            AMENDED COMPLAINT**
11
                Defendants.
12  _____/
13        Defendants Catamaran PBM of Illinois, Inc., fka InformedRx, Inc., and Catamaran,

14  Inc., fka SXC Health Solutions, Inc. (collectively, the "Catamaran Defendants"), move to

15  dismiss and strike the third amended complaint ("TAC") filed by plaintiff Jajco, Inc., dba

16  Anchor Drugs Pharmacy ("Anchor").  The court determines that the matter is suitable for

17  decision without oral argument and VACATES the motion hearing.  For the reasons set

18  forth below, the Catamaran Defendants' motion to dismiss the TAC is DENIED.

19  **I.      BACKGROUND**

20        **A.      Factual Summary**

21        This case concerns a system of payment for pharmacy benefits among health care

22  providers, pharmacies, pharmacy service administrative organizations, and pharmacy

23  benefits managers.  Anchor operates four pharmacies in San Mateo County which

24  distribute pharmaceuticals to local patrons enrolled in a variety of health plans.  The four

25  pharmacies operated by Anchor are called Anchor Drugs Pharmacy I, Anchor Drugs

26  Pharmacy II, Anchor Drugs Pharmacy III and Anchor Drugs Long-term Care Pharmacy.

27        According to the allegations of the TAC, Defendant Leader Drugstores, Inc.

28  ("Leader") is one of the industry's largest pharmacy services administrative organizations

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

(PSAOs), which manages network contracting and plan administration for independent pharmacies.  Leader enters into contracts with independent pharmacies thereby enabling these pharmacies to become participants in the LeaderNET program.  Through LeaderNET, the pharmacies are then allowed to participate in a variety of pharmacy benefit plans offered by employers, health maintenance organizations, insurance companies and similar organizations, sometimes referred to as Pharmacy Benefit Managers (PBMs). Specifically, Leader enters into contracts with various PBMs and other health plans on behalf of these independent pharmacies so that the pharmacies may service individuals whose pharmacy benefits are covered through the PBMs and health plans.  One such health plan is Health Plan of San Mateo (HPSM).  The pharmacies service low-income individuals who depend on government health benefits, such as Medicare and Medi-Cal, who are enrolled with HPSM through either their CareAdvantage HMO or Ace Programs. TAC ¶¶ 22-25.

Through a service called Central Pay, Leader also provides a centralized electronic payment processing center for each of its participating pharmacies, whereby all claims are submitted electronically by each pharmacy to Central Pay.  Each PBM or health plan receives the claims through Central Pay, and then submits payments for these claims directly into Central Pay.  These payments are then credited to the pharmacy's Central Pay account.  Central Pay, in essence, operates much like a bank account for each pharmacy in that it collects all of the outstanding claims into one ledger for each participating pharmacy, and all payments and any deductions are processed and reconciled as part of one ledger.  TAC ¶¶ 26-27.

Three of the Anchor pharmacies entered into written contracts with Leader to participate in the LeaderNET program.  Pursuant to these contracts, Leader agreed to "use its best efforts on behalf of [Anchor] to contract with various employers, unions, insurance companies and other groups providing pharmaceutical benefits to participate in [LeaderNETs managed care program]."  In turn, each of the Anchor pharmacies agreed to provide pharmaceutical services to each of the PBMs and other health plans with which

2

United States District Court
For the Northern District of California

1   Leader has contracted.  One such pharmacy benefit manager is InformedRx.  InformedRx

2   is currently known as Catamaran PBM of Illinois, Inc., which is wholly owned by Catamaran

3   Inc., fka SXC Health Solutions, Inc.  TAC ¶ 33.

4        InformedRx contracted with HPSM to assist in processing and paying the claims

5   submitted by HPSM's enrollees.  Anchor alleges that the contract between InformedRx and

6   HPSM enabled independent pharmacies that contracted with Leader, such as Anchor, to

7   provide pharmaceutical services to individuals whose pharmacy benefits are covered

8   through HPSM, because HPSM was part of InformedRx's PBM network.  For providing

9   these services, Anchor receives a fee pursuant to reimbursement formulas that were

10  agreed to between InformedRX and Leader.  InformedRx processes and pays the

11  CareAdvantage/Medi-Cal claims submitted by Anchor to HPSM through Central Pay.

12  Anchor has no direct contractual relationship with InformedRx.  TAC ¶¶ 33-35, 55, 73.

13       Anchor alleges that around October  2011, InformedRx began making unilateral and

14  unexplained lump sum deductions from Anchor's Central Pay accounts in various amounts.

15  Anchor alleges that InformedRx made these deductions without any explanations,

16  documentation nor permission from Anchor to do so.  These deductions were made directly

17  from monies owed either by HPSM or other third party payers for services provided to

18  enrolled patients.  Anchor alleges that because all payments owed to the Anchor

19  Pharmacies from each PBM were collected into Central Pay, InformedRx's unilateral

20  withdrawals from each of Anchor's Central Pay accounts effectively prevented the Anchor

21  Pharmacies from receiving funds paid into the account by HPSM or even by other PBMs,

22  even though those payments are totally unrelated to HPSM or InformedRx.  TAC ¶¶ 37-43.

23       Anchor also alleges that it has been underpaid for dispensing pharmaceuticals to

24  certain HPSM CareAdvantage/Medi-Cal participants.  Anchor alleges that InformedRx

25  failed to pay the appropriate reimbursement rate that was negotiated between HPSM and

26  SXC Health Solutions, Inc. which delegated responsibility to InformedRx for making

27  payments.  TAC ¶ 56.  Anchor seeks an accounting to determine the amount of damages.

28

1

**B.    Procedural History**

On November 28, 2011, Anchor filed a complaint in San Mateo County Superior Court against defendants (1) Cardinal Health, Inc., (2) Cardinal LDS, Inc. dba Leader Drugstores, Inc., (3) InformedRx, Inc., and (4) Health Plan of San Mateo (HPSM).  Anchor amended the complaint to name Leader Drugstores as Doe defendant no. 1 on February 9, 2012.  Anchor filed a first amended complaint (FAC) on or about May 10, 2012.  On July 19, 2012, Anchor amended the FAC to add SXC Health Solutions, Inc. as Doe no. 2; Catamaran, Inc. as Doe no. 3; and Catamaran Corporation as Doe no. 4.   Anchor further amended the FAC on October 25, 2012, to add Catamaran PBM of Illinois, Inc. as Doe no. 5.  Anchor dismissed HPSM from the state court action on October 31, 2012.

InformedRx then removed this action from state court on diversity grounds on November 6, 2012.  By stipulation of the parties, the court granted Anchor leave to file the SAC on January 7, 2013.  The Catamaran Defendants and Catamaran Corporation filed a motion to dismiss claims alleged in the SAC, which the court granted with leave to amend the third party beneficiary contract claims "to allege that the terms of the contracts express an intent to benefit third parties such as Anchor, rather than only incidentally or remotely benefitting Anchor."  Doc. no. 33 at 2.

Anchor filed the TAC on April 4, 2013.  Anchor alleges the following claims:

1.    Breach of contract against Leader Drugstores, Inc.;

2.    Breach of contract against the Catamaran Defendants;

3.    Conversion against all defendants;

4.    Intentional interference with contractual relations against the Catamaran Defendants;

5.    Intentional interference with prospective economic advantage against the Catamaran Defendants;

6.    Negligent interference with prospective business advantage against the Catamaran Defendants;

7.    Unfair business practices against the Catamaran Defendants; and

United States District Court

For the Northern District of California

8.     Accounting against Leader Drugstores, Inc.

The Catamaran Defendants now move to dismiss the breach of contract claim alleging that Anchor is a third party beneficiary under the InformedRx-HPSM contract, and to strike the claim for attorney's fees.  Because Anchor did not allege a third party beneficiary claim in the SAC, and because the court granted leave to amend the breach of contract claim in granting the motion to dismiss the SAC, the Catamaran Defendants are not barred from raising their arguments in a successive motion pursuant to Federal Rule of Civil Procedure 12(b) and (g).  The instant motion is fully briefed and is deemed submitted on the papers.

## II.     LEGAL STANDARD

### A.     Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  Review is limited to the contents of the complaint.  *Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.*, 69 F.3d 381, 385 (9th Cir. 1995).  To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8.

Rule 8(a)(2) requires only that the complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Specific facts are unnecessary – the statement need only give the defendant "fair notice of the claim and the grounds upon which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  All allegations of material fact are taken as true.  *Id.* at 94.  However, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citations and quotations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  *Id.*

A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face.  *See id.* at 558-59.  "[W]here the

1    well-pleaded facts do not permit the court to infer more than the mere possibility of

2    misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to

3    relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

4        **B.**    **Motion to Strike**

5          Under Federal Rule of Civil Procedure 12(f), the court "may order stricken from any

6    pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous

7    matter." Fed. R. Civ. P. 12(f).  The function of a motion to strike under Rule 12(f) is to

8    "avoid the expenditure of time and money that must arise from litigating spurious issues by

9    dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d

10   970, 973 (9th Cir. 2010) (quotation and citation omitted).  To determine whether to grant a

11   motion to strike under Rule 12(f), the court must determine whether the matter the moving

12   party seeks to have stricken is (1) an insufficient defense; (2) redundant; (3) immaterial; (4)

13   impertinent; or (5) scandalous.  *Id.* at 973-74.

14         Motions to strike are not favored and "should not be granted unless it is clear that

15   the matter to be stricken could have no possible bearing on the subject matter of the

16   litigation." *Colaprico v. Sun Microsystem, Inc.*, 758 F.Supp. 1335, 1339 (N.D. Cal. 1991).

17   When a court considers a motion to strike, it "must view the pleading in a light most

18   favorable to the pleading party." *In re 2TheMart.com, Inc. Sec Lit.*, 114 F. Supp. 2d 955,

19   965 (C.D. Cal. 2000).  A court must deny the motion to strike if there is any doubt whether

20   the allegations in the pleadings might be relevant in the action.  *Id.*

21   **III.**    **DISCUSSION**

22         The Catamaran Defendants move to dismiss the second cause of action for breach

23   of contract on the ground that the TAC fails to allege that Anchor is a third party beneficiary

24   of InformedRx's contract with HPSM.   The moving defendants do not challenge the third

25   party beneficiary claim  based on InformedRx's contract with Leader.  The Catamaran

26   Defendants also move to strike the prayer for attorney's fees.

27

28

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.    Third Party Beneficiary Claim

Anchor's theory of liability for breach of contract against the Catamaran Defendants is that Anchor is a third party beneficiary of the InformedRx-HPSM contract.  The Catamaran Defendants seek dismissal of this claim on the ground that the InformedRx-HPSM contract includes an express provision disclaiming third party beneficiaries.  Under Ninth Circuit authority, a third party may enforce a contract as a third party beneficiary despite a general contractual disclaimer where there is evidence that the parties to the contract intended to benefit third parties.  *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1163 (9th Cir. 2010) ("*Balsam II*").

### 1.    Legal Standard

The parties agree that California law governs the breach of contract claims against InformedRx.  Under California law, "'[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it.'"  *Arata v. Bank of Am. Nat. Trust & Sav. Ass'n*, 223 Cal. App. 2d 199, 205 (1963) (quoting Cal. Civ. Code § 1559).  "'The test for determining whether a contract was made for the benefit of a third person is whether an intent to benefit a third person appears from the terms of the contract.'"  *Id.* (quoting *Johnson v. Holmes Tuttle Lincoln-Mercury, Inc.*, 160 Cal. App. 2d 290, 297 (1958) (internal citation omitted)).  "The intent to make the obligation inure to the benefit of a third party must be clearly manifested by the contracting parties in order for the beneficiary to maintain an action.  The contract does not have to be for the exclusive benefit of a third party to be enforceable by him; both contracting parties can receive benefits under an enforceable third party beneficiary contract."  *Id.* (citations omitted).

"If the terms of the contract necessarily require the promisor to confer a benefit on a third person, then the contract, and hence the parties thereto, contemplate a benefit to the third person."  *Johnson*, 160 Cal. App. 2d at 297.  "[T]he third person need not be named or identified individually to be an express beneficiary.  A third party may enforce a contract if it can be shown that he or she is a member of the class for whose express benefit the contract was made."  *Kaiser Engineers v. Grinnell Fire Prot. Sys. Co.*, 173 Cal. App. 3d

1    1050, 1055 (1985) (internal citations omitted).  "Whether a third party is an intended

2    beneficiary or merely an incidental beneficiary to the contract involves construction of the

3    parties' intent, gleaned from reading the contract as a whole in light of the circumstances

4    under which it was entered.  *Balsam v. Tucows Inc.*, 2009 WL 3463923 (N.D. Cal. Oct. 23,

5    2009) ("*Balsam I*") (citing *Landale-Cameron Court, Inc. v. Ahonen*, 155 Cal. App. 4th 1401,

6    1411 (2007)) (internal quotation marks omitted), *aff'd*, 627 F.3d 1158 (9th Cir. 2010).

7    **2.    Sufficiency of Allegations**

8    The breach of contract claims against InformedRx at issue here are those based on

9    InformedRx's alleged failure to pay the contractual reimbursement rate to Anchor for

10   HPSM's Medi-Cal and Medicare patients' medications.  TAC ¶¶ 74-79.

11   Section 1559 of the California Civil Code provides, "A contract, made expressly for

12   the benefit of a third person, may be enforced by him at any time before the parties thereto

13   rescind it."  The Catamaran Defendants rely on a general provision of the InformedRx-

14   HPSM contract to demonstrate the parties' intent not to benefit third parties:

15       <u>Independent Contractors</u>.  Each Party is an independent entity and
         nothing in this Agreement shall be construed to establish an
16       employer/employee or principal/agent relationship or any fiduciary or
         other relationship other than independent parties contracting with
17       each other for the purpose of carrying out the duties and obligations
         of this Agreement.  Nothing in this Agreement is intended or shall be
18       construed to confer upon any person or entity (including Participating
         Pharmacies, Covered Manufacturers and Eligible Members) other
19       than the parties hereto and their successors or permitted assigns,
         any rights or remedies under or by reason of this Agreement.

20

21   Higgins Decl., Ex. A ¶ 9(e).  In the current motion to dismiss, the Catamaran Defendants

22   contend that this contractual clause clearly expresses the parties' intent not to benefit third

23   parties.  Mot. at 8 (citing *Pegasus Satellite Television, Inc. v. DirecTV, Inc.*, 318 F. Supp. 2d

24   968, 977 (C.D. Cal. 2004)).  In *Pegasus Satellite*, the district court held that the plaintiff was

25   not a third party beneficiary to an agreement to distribute programming and services

26   offered by DIRECTV.  The court found that a clause in the agreement, stating that "The

27   provisions of this Agreement are for the benefit only of the parties hereto, and no third party

28   may seek to enforce, or benefit from, these provisions,"  clearly stated that there are no

*United States District Court*
For the Northern District of California

8

1   third-party beneficiaries to the contract. *Id.* The district court in *Pegasus Satellite*

2   concluded, *"*Although it is not necessary that the contract identify or refer to the third-party

3   beneficiary by name, the Court has not found any authority that would allow it to abrogate

4   an express no third-party beneficiary provision in direct contravention of the mandate of

5   California Civil Code section 1559." *Id.*

6        After *Pegasus Satellite* was decided, the Ninth Circuit held that a clause disclaiming

7   any third-party beneficiaries is strong evidence of intent not to create any obligations to

8   third parties, but is not necessarily dispositive of whether a third party qualifies as a

9   beneficiary. *Balsam II*, 627 F.3d at 1163 (holding that "[g]iven the absence of any evidence

10  to the contrary," a "No Third Party Beneficiaries"  clause "unambiguously manifests an

11  intent *not* to create any obligations to third parties").  In *Balsam II*, the court of appeals

12  upheld the district court's order granting the motion to dismiss the plaintiff's claims based

13  on his alleged status as a third party beneficiary to the Registrar Accreditation Agreement

14  ("RAA") signed by the defendant, a registrar of domain names, as a requirement for

15  registering domain names with the Internet Corporation for Assigned Names and Numbers

16  ("ICANN").  The district court rejected the plaintiff's argument that a specific clause in the

17  contract was indicative of the parties' intent to benefit third parties, and held, "While it is of

18  course possible for parties to intend to benefit third parties despite contractual language

19  disclaiming third party beneficiaries, the parties to the ICANN RAA evidenced no such

20  intent." *Balsam I*, 2009 WL 3463923 at *4-5.

21       In affirming the district court, the Ninth Circuit noted that under California law,

22  "specific contractual provisions may control over a general clause." *Balsam II*, 627 F.3d at

23  1161 (citing *Prouty v. Gores Technology Group*, 121 Cal. App. 4th 1225 (2004) ("when a

24  general and a particular provision are inconsistent, the particular and specific provision is

25  paramount to the general provision.")).  After reviewing the specific clause at issue, the

26  court of appeals determined that the contract provision did not benefit, or confer any rights

27  upon, any third party. *Balsam II*, 627 F.3d at 1161-62.

28

United States District Court
For the Northern District of California

1   Neither party cites or discusses *Balsam II*, which controls here.  The Catamaran

2   Defendants argue that in light of the express disclaimer of third party beneficiaries, the

3   InformedRx-HPSM contract does not "expressly" intend to benefit Anchor pursuant to Cal.

4   Civ. Code § 1559.  Mot. at 5-6.  The Catamaran Defendants cite *Pegasus Satellite* for the

5   proposition that the term "[e]xpressly, as used in section 1559, means 'in an express

6   manner, in direct or unmistakable terms; explicitly; definitely; directly.'"  318 F. Supp. 2d at

7   977 (quoting *Diamond Woodworks, Inc. v. Argonaut Ins. Co.*, 109 Cal. App. 4th 1020, 1040

8   n. 15 (2003) (internal citation omitted), *overruled on other grounds by Simon v. San Paolo*

9   *U.S. Holding Co., Inc.*, 35 Cal. 4th 1159, 1182-83 (2005)).  This statement must, however,

10  be properly read in the context of settled rules of contract interpretation for determining

11  whether a third party is an intended or merely incidental beneficiary under Civil Code

12  section 1559: "The word 'expressly,' by judicial interpretation, has now come to mean

13  merely the negative of 'incidentally.'"  *Prouty*, 121 Cal. App. 4th at 1232-33.  *See also*

14  *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1022 (2009)

15  (same).  Thus, as the court recognized in *Balsam II*, the question of whether a third party is

16  an intended beneficiary "'involves construction of the intention of the parties, gathered from

17  reading the contract as a whole in light of the circumstances under which it was entered.'"

18  627 F.3d at 1161 (quoting *Prouty*, 121 Cal. App. 4th at 1233).  In particular, the Ninth

19  Circuit cited *Prouty* to state the principle of contract interpretation that a specific provision

20  controls over a general provision, where inconsistent.  *Id.*

21  Applying that principle of contract interpretation here, Anchor has sufficiently alleged

22  that various provisions in the InformedRx-HPSM Client Services Agreement demonstrate

23  the parties' intent to benefit third party pharmacies such as Anchor.  For example, Anchor

24  alleges that it was intended to receive a contractual rate of reimbursement for providing

25  services as a Participating Pharmacy under the InformedRx-HPSM contract, which

26  provides that "[InformedRx will process Claims received from Participating Pharmacies and

27  Eligible Members, determine whether such Claims qualify for reimbursement . . .  and

28  determine the payment applicable to the Claim."  Higgins Decl., Ex. A at IRX 00041; TAC

10

United States District Court

For the Northern District of California

1    ¶ 74.  The Catamaran Defendants respond that this and other provisions refer to

2    "Participating Pharmacies" which are not intended to benefit Anchor because the contract

3    defines a "Participating Pharmacy" as one "that has entered into an agreement with

4    [InformedRx]."  Reply at 3 (citing Higgins Decl., Ex. A at IRX00065.).  Anchor concedes that

5    it did not directly contract with InformedRx, but argues that it is a retail pharmacy that filled

6    prescriptions for patients under the InformedRx-HPSM contract.  Opp. at 6.  Although

7    Anchor is not named or identified in the InformedRx-HPSM contract, Anchor has sufficiently

8    alleged a course of subsequent conduct showing that InformedRx paid Anchor for

9    prescriptions that Anchor filled for participants in HPSM's CareAdvantage/Medi-Cal

10   programs, as evidence of intent to benefit pharmacies such as Anchor.  TAC ¶¶ 33-34, 37-

11   51, 54-55.  *See Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998) ("The mutual intention

12   to which the courts give effect is determined by objective manifestations of the parties'

13   intent, including the words used in the agreement, as well as extrinsic evidence of such

14   objective matters as the surrounding circumstances under which the parties negotiated or

15   entered into the contract; the object, nature and subject matter of the contract; and the

16   subsequent conduct of the parties.") (citing Cal. Civ. Code §§ 1635–1656; Cal. Code Civ.

17   Proc. §§ 1859–1861, 1864).

18          Furthermore, Anchor identifies a particular contract provision which does not use the

19   term "Participating Pharmacy," and which states as follows:

20          "Under the Pass Through Pricing Model, Client [HPSM] shall pay the
            actual retail pharmacy rates paid by IRX for prescriptions
21          electronically processed and dispensed to a Member through IRX's
            retail pharmacy network, which are the rates set forth above."
22

23   Higgins Decl., Ex. A at IRX00048.  Anchor argues that this provision obligates InformedRx

24   to pay Anchor for prescriptions it filled under the rates set by the Health Plan of San Mateo

25   Network Fee Schedule.  Opp. at 7 and TAC ¶ 76 (alleging that InformedRx agreed to a

26   "pass-through pricing model" at the contracted rates).  Reading the contract as a whole and

27   in light of the circumstances under which it was entered, Anchor's allegations are sufficient

28   to state a claim as a third party beneficiary under the InformedRx-HPSM contract.

United States District Court

For the Northern District of California

1    Anchor also points out that InformedRx and HPSM signed an addendum to the

2 Client Services Agreement, in which InformedRx agreed to provide Medicare Part D

3 services and agreed to "provide a real time on-line claims processing system to adjudicate

4 drug claims by network pharmacies on behalf of Eligible Members. . . . [InformedRx] shall

5 also provide a paper claims processing system designed to pay claims submitted by non-

6 network pharmacies on behalf of Eligible Members." Opp. at 6 and TAC ¶ 74.  Anchor

7 contends that InformedRx used this claims processing system to process prescriptions

8 filled by Anchor and subsequently to pay Anchor.  Opp. at 6 and TAC ¶¶ 73-74.  The

9 Catamaran Defendants respond that the addendum describes responsibilities specifically

10 related to Medicare Part D services and argue that it is unrelated to the lawsuit which

11 concerns HPSM's CareAdvantage/Medi-Cal Program, not Medicare Part D.  Reply at 3.

12 Anchor contends, however, that Anchor also processed prescriptions for HPSM members

13 with Medicare Part D.  Opp. at 6.  *See* TAC ¶ 74.  At the pleading stage, particularly where

14 Anchor seeks an accounting of the payments for pharmaceutical services it provided to

15 HPSM enrollees, the allegations are sufficient to give the Catamaran Defendants fair notice

16 of the third party beneficiary claim and the grounds upon which it rests.

17    The specific contractual provisions identified by Anchor support its allegations that

18 InformedRx and HPSM intended to benefit third parties such as the pharmacies which

19 would submit claims for reimbursement.  Because the general disclaimer of third party

20 beneficiaries is inconsistent with the particular provisions that may be reasonably construed

21 to confer a right or benefit to participating pharmacies such as Anchor, this matter presents

22 a factual dispute that is not suitable for resolution on a motion to dismiss.  *See Prouty*, 121

23 Cal. App. 4th at 1233 ("Generally, it is a question of fact whether a particular third person is

24 an intended beneficiary of a contract.").  *See also Diamond Woodworks, Inc. v. Argonaut*

25 *Ins. Co.*, 109 Cal. App. 4th 1020, 1041 (2003) (finding sufficient evidence to support jury

26 finding that employer was third party beneficiary to workers compensation insurance policy

27 issued to employee leasing company, where the court found that the insurance coverage

28

United States District Court

For the Northern District of California

1 | "was not an incidental benefit to Diamond; it was at the very heart of the employee leasing

2 | contract and the insurance policy.").

3 | The facts alleged here, taken as true, and drawing all inferences in the light most

4 | favorable to the non-moving party, sufficiently show that Anchor is a "member of a class for

5 | whose benefit the contract [between HPSM and InformedRx] was created." *Kaiser*

6 | *Engineers,* 173 Cal. App. 3d at 1055.  Anchor therefore pleads a plausible third party

7 | beneficiary claim under California law, and the Catamaran Defendants' motion to dismiss

8 | for failure to state a claim is accordingly DENIED.

9 | **3.    Claims Against Catamaran Inc., formerly SXC**

10 | The Catamaran Defendants move to dismiss the claim for breach of the InformedRx-

11 | HPSM contract against non-signatory Catamaran Inc., fka SXC Health Solutions, Inc.

12 | (InformedRx's parent company), for lack of allegations that Catamaran Inc. entered a

13 | contract with HPSM or breached such a contract.

14 | To support its alter ego theory, Anchor alleges that the CFO of the Catamaran

15 | Defendants, Jeff Park, was directly involved with the efforts to withdraw funds from

16 | Anchor's Central Pay accounts. TAC ¶ 18.  The TAC alleges that Park was the CFO of

17 | both InformedRx and SXC before the corporate merger resulting in the successor

18 | coporations, Catamaran PBM of Illinois, Inc. and Catamaran Inc., respectively. *Id.*  The

19 | TAC also alleges that Park's actions "were done on behalf of both entities and there was no

20 | difference between the two corporations as they attempted to withdraw and eventually

21 | convert Anchor's funds." *Id.*  The TAC also re-alleges, in a conclusory fashion, that "[t]here

22 | exists . . . a unity of interest in ownership between certain defendants and other certain

23 | defendants such that any individuality and separateness between the certain defendants

24 | has ceased and these defendants are the alter ego of the other certain defendants and

25 | exerted control over those defendants."  TAC ¶ 13.

26 | Under California law, alter ego is an extreme remedy, requiring that two conditions

27 | be met before the alter ego doctrine will be invoked:

28 |

1
2
3
4
5
6
7
8

United States District Court
For the Northern District of California

> First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist.  Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone.  "Among the factors to be considered in applying the doctrine are commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other."  [Citations omitted.]  Other factors which have been described in the case law include inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers.

*Sonora Diamond Corp. v. Superior Court,* 83 Cal. App. 4th 523, 538-39 (2000).  The allegations of the TAC, taken as true, are sufficient to plausibly plead Catamaran Inc.'s alter ego liability for InformedRx.  The motion to dismiss the claims against Catamaran Inc. is therefore DENIED.

### B.      Motion to Strike Prayer for Attorney's Fees

The Catamaran Defendants contend that California Civil Code § 1021.5 (private attorney general doctrine) is not applicable because Anchor has not alleged that prevailing in this suit will result in the enforcement of an important right affecting the public interest; and that a significant benefit, whether pecuniary or nonpecuniary will be conferred on the general public or a large class of persons, and that the necessity and financial burden of private enforcement are such as to make the award appropriate.  *See Woodland Hills Residents Assn., Inc. v. City Council,* 23 Cal. 3d 917, 935 (1979).  Rather, they argue that Anchor's lawsuit concerns an accounting dispute that is essentially a private dispute that does not concern the public.

Anchor contends that a claim for damages is not appropriate grounds to strike the complaint under Rule 12(f), citing *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973-74 (9th Cir. 2010).  In *Whittlestone*, the defendant argued that the plaintiff's prayer for damages should be stricken because the damages plaintiff was seeking were precluded as a matter of law.  The court held, however, the prayer for damages could not be stricken as a matter of law pursuant to a Rule 12(f) motion, because the prayer for damages was not

14

United States District Court

For the Northern District of California

1    an insufficient defense; was not redundant, as it did not appear elsewhere in the complaint;

2    was not immaterial, "because whether these damages are recoverable relates directly to

3    the plaintiff's underlying claim for relief; was not impertinent, "because whether these

4    damages are recoverable pertains directly to the harm being alleged;" and was not

5    scandalous. *Whittlestone*, 618 F.3d at 974-75.  Under *Whittlestone,* Rule 12(f) does not

6    authorize the striking of a claim for damages on the ground that it is precluded as a matter

7    of law.  Accordingly, the Catamaran Defendants' motion to strike the prayer for attorney's

8    fees is DENIED.  *See Ferretti v. Pfizer Inc.*, 855 F. Supp. 2d 1017, 1029 (N.D. Cal. 2012).

9            The Catamaran Defendants alternatively ask that the motion to strike be converted

10   into a motion to dismiss.  Reply at 5-6.  The court declines to do so.  The determination

11   whether Anchor is entitled to an award of fees must be made on the basis of the entire

12   record, and is not suitable for disposition on a motion to dismiss.  *See Choi v. Orange Cnty.*

13   *Great Park Corp.*, 175 Cal. App. 4th 524, 528-29 (2009).

14   **IV.    CONCLUSION**

15           For the reasons stated above, the Catamaran Defendants' motion to dismiss and

16   strike the TAC is DENIED.  The June 5, 2013 hearing date is VACATED.

17   **IT IS SO ORDERED.**

18
     Dated:  May 31, 2013
19                                                      _____
20                                                      PHYLLIS J. HAMILTON
                                                        United States District Judge
21

22

23

24

25

26

27

28